IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

DENNIS EVAN FALLOW, as Personal
Representative of the ESTATE OF
KATHERINE FALLOW

                Plaintiff,

       v.

BANKERS LIFE AND CASUALTY
COMPANY,

              Defendant.

Case No. 1:11-cv-03088-CL

**ORDER**

CLARKE, Magistrate Judge.

    This matter comes before the court on plaintiff's motion for partial summary judgment

(#44), defendant's motion for summary judgment (#48), defendant's motion to strike (#53), and

plaintiff's motion for leave to file a third amended complaint (#68). For the reasons stated

below, plaintiff's motion for partial summary judgment is granted, defendant's motion for

summary judgment is granted in part and denied in part, defendant's motion to strike is denied,

and plaintiff's motion for leave to amend is granted in part and denied in part.

## PROCEDURAL HISTORY

Plaintiff Dennis Evan Fallow ("plaintiff") originally filed this action on April 14, 2011, in the Josephine County Circuit Court. Fallow v. Bankers Life and Casualty Co., Case No. 11CV0401. On July 27, 2011, defendant Bankers Life and Casualty Company ("Bankers") removed the case to federal court, alleging jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332. The parties executed written consents to entry of judgment by a magistrate judge (#26). Oral argument occurred on November 20, 2012.

## BACKGROUND

The material facts are not in dispute. Plaintiff is Katherine Fallow's son and the personal representative of her estate. At all material times, Katherine Fallow resided in Grants Pass, Oregon. Bankers is an Illinois corporation that provides long-term care insurance to Oregon consumers.

On February 15, 2002, Bankers issued a Tax Qualified Home Health Care Policy ("the Policy") to Katherine Fallow. Pltf. Ex. A. The Policy covered long-term care expenses, including regular visits by a "Home Health Aide," defined in the Policy as "a licensed or certified home health care worker, other than a Physician, nurse or professional therapist, who performs Personal Care Services." The Policy further required that the Home Health Aide be either part of a Home Health Care Agency, or be an independent "Qualified Home Health Care Provider." The Policy defined "Qualified Home Health Care Provider" as "an individual or organization licensed or certified to prove home health care services."

In June 2009, Katherine Fallow began receiving in-home care from Linda Davis, a private caregiver who had previous experience caretaking in the state of Washington. On July 2, 2009, Plaintiff, as Katherine Fallow's power of attorney, filed a claim to be reimbursed for

Davis' work as a Home Health Aide. Pltf. Ex. B. Plaintiff attached Davis' credentials to the claim, which included a certificate from the state of Washington's Aging and Adult Services Administration, dated November 16, 2000, for completing a three-day "Caregiving Fundamentals" course, and three certificates, dated between 2000 and 2003, from Ferry County Community Services in Washington state for completing continuing education courses on senior information and assistance. On August 19, 2009, Bankers informed Katherine Fallow that she was eligible for benefits beginning May 13, 2009, and that Davis met the Policy's requirements for Home Health Aides. Pltf. Ex. C.

On September 2, 2009, plaintiff informed Bankers that three other caregivers, Lorrie Watters, Yvonne Archer, and Jill Colin, had begun caring for Katherine Fallow. Pltf. Ex. D. Plaintiff attached the caregivers' credentials, which indicated that Lorrie Watters was registered with the State of Oregon's Home Health Care Commission[1] and had previously provided home health care for seniors through Oregon's Senior and Disabilities Program, and that Yvonne Archer and Jill Colin were Certified Nursing Assistants ("CNAs"). Pltf. Ex. J.

On December 9, 2009, a Bankers care management specialist, in a routine check, reviewed Katherine Fallow's caregivers' daily visit notes and documentation to substantiate their eligibility under the Policy. As part of the review, the care management specialist telephoned Davis and asked if she was a CNA or part of an Oregon Home Health Care Agency. Davis stated that she was not. The care management specialist reviewed Watters's credentials and found that Watters also was not a CNA or part of an Oregon Home Health Care Agency. The Bankers care management specialist then called plaintiff and told him that neither Davis nor

---

[1] The Oregon Home Health Care Commission's registry provides a listing of people looking for work as home health aides and does not provide any form of licensing or certification.

Watters qualified under the Policy as Home Health Aides because they were not CNAs or licensed by the state of Oregon to provide home health care services.

On January 4, 2010, plaintiff sent Bankers a letter asking Bankers to review its decision to deny reimbursement for the work of Davis and Watters. Bankers reviewed the matter and upheld its decision, stating that that a Home Health Aide who was not part of a Home Health Care Agency must be a "Qualified Home Health Care Provider," which the Policy defined as "an individual or organization licensed or certified to provide home health care services." Because neither Davis nor Watters were CNAs or licensed by the state of Oregon to provide home health care services, Bankers contended they did not meet the Policy's definition of a Qualified Home Health Care Provider and thus were not eligible for reimbursement.

Despite Bankers' letter, plaintiff continued to employ Davis and Watters, maintaining that they were eligible as Home Health Aides under the Policy. Bankers continued to deny coverage. On October 8, 2010, in an effort to resolve the dispute, Bankers sent plaintiff a letter stating that it would reimburse plaintiff for Davis' and Watters' work up to the Maximum Weekly Benefit of the Policy for their work performed through mid-October. Pltf. Ex. L. In conjunction with the letter, Bankers sent plaintiff checks later in October for a total of $9,097.01. Plaintiff refused this offer.

On February 21, 2011, in response to denied requests for reimbursement for other workers caring for Katherine Fallow, Bankers send plaintiff a letter stating that anyone providing home health services under the Policy who is not employed by a Home Health Care Agency must be "(a) a currently licensed Registered Nurse; (b) a Licensed Practical Nurse; (c) a Certified Nurse Aide; or (d) included in a government sponsored Nurse Aide Registry." Despite the letter,

plaintiff continued to employ Davis, Watters, and other workers who did not meet this definition until Katherine Fallow's death in July 2011.

Plaintiff brings three claims in its Second Amended Complaint. Plaintiff alleges (1) Bankers breached its insurance contract by refusing to cover the care Katherine Fallow received from Davis[2]; (2) Bankers acted in bad faith in refusing to initially reimburse plaintiff for care received from Davis and Watters; and (3) Bankers committed fraud by representing that Davis told Bankers that she was not a Home Health Aide. Plaintiff prays for economic damages, non-economic damages, punitive damages, "unpaid premiums," and attorney fees.

On August 7, 2012, plaintiff moved for partial summary judgment on plaintiff's first claim for breach of contract (#44). On August 14, 2012, Bankers filed its own motion for summary judgment (#48), arguing that Bankers did not breach its insurance contract, and, even if Bankers had, plaintiff is entitled only to economic damages in the amount of the unpaid Policy benefits. Bankers also moved for summary judgment on plaintiff's second and third claims for bad faith and fraud. On August 31, 2012, Bankers moved to strike exhibits attached to plaintiff's memo in support of its motion for partial summary judgment (#54), arguing that the exhibits were not properly authenticated and contained inadmissible hearsay.

On October 5, 2012, plaintiff filed a motion for leave to file a third amended complaint (#68), seeking to amend its fraud claim and add new caregivers to its breach of contract and bad faith claims. Bankers filed an objection to plaintiff's motion on October 19, 2012 (#71).

## PRELIMINARY PROCEDURAL MATTER

As an initial matter, the court must address the admissibility of the evidence offered by plaintiff in support of its motion for summary judgment. Bankers moved to strike Exhibits 2

---

[2] The court notes that plaintiff's breach of contract claim relates only to Davis' work and not to other home healthcare workers.

through 16 attached to plaintiff's memo in support of its motion for summary judgment, arguing

that the documents were not properly authenticated and contained inadmissible hearsay.  In

response, plaintiff filed supplemental declarations in support of its motion for partial summary

judgment.  Bankers did not file a reply.

The court finds that plaintiff's supplemental declarations properly authenticate the

exhibits, and that the declarations lay foundations for applicable hearsay exceptions.  For

example, Exhibits 2, 5, 11, and 12 include resumes and certificates for completion of trainings by

various homecare providers for Katherine Fallow.  Plaintiff's supplemental materials include

declarations by the homecare providers establishing that the exhibits meet the business records

exception to the hearsay rule.[3]  Based on the material in plaintiff's supplemental declarations,

Bankers' motion to strike is DENIED.

## APPLICABLE INSURANCE POLICY PROVISIONS

### I.    Coverage Grant.

The Policy in the coverage grants provides as follows:

The charges incurred for the following services and supplies provided by a *Home Health Care Agency* or a *Qualified Home Health Care Provider* under a Plan of Care:

a.   Visits by: a licensed nurse; a licensed nutritional specialist; a medical social worker; a *Home Health Aide*; and a legally qualified physical, occupational, speech or inhalation therapist;
b.   Prescription drugs, medicines, medical supplies and laboratory services which are of a type customarily provided in a Hospital or Nursing Home;
c.   Rental (not to exceed purchase price) of a wheelchair, hospital bed and other durable portable equipment used for therapeutic treatment;
d.   Personal Care Services; and
e.   Homemaker Services Incidental to Personal Care Services.

---

[3] Hearsay evidence may be admissible under the business records exception if the evidence is a record of regularly conducted activity and was (1) made at or near the time of the event by someone with knowledge; (2) the record was kept in the course of regularly conducted activity of a business or organization; (3) making the record was a regular practice of that activity; (4) all of these conditions are shown by the testimony of the custodian or by certification compliant with Rule 902(11); and (5) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness. Fed. R. of Evid. 803(6).

Pltf. Ex. A, p. 15 (emphasis added).

## II.    Definitions.

The Policy defines a *Health Home Aide* as:

"[A] licensed or certified home health care worker, other than a Physician, nurse or professional therapist, who performs Personal Care Services."

The Policy defines a *Home Health Care Agency* as an agency or organization that:

a.   Specializes in giving nursing care or therapeutic services in the home;
b.   Is licensed to provide such care or services by the appropriate licensing agency where they are performed or is certified as a Home Health Care Agency under Title XVIII of the Social Security Act of 1965, as amended;
c.   Is operating within the scope of its license or certification; and
d.   Maintains a complete medical record and Plan of Care for each patient.

Pltf. Ex. A., p. 16 (emphasis added).

The Policy defines a *Qualified Home Health Care Provider* as:

"[A]n individual or organization licensed or certified to provide home health care services.  The Qualified Home Health Care Provider must be included in the Plan of Care as the provider of home health care services."

Id. (emphasis added).

## SUMMARY JUDGMENT

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. Rivera v. Philip Morris, Inc., 395 F.3d 1142, 1146 (9th Cir. 2005) (*citing* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A fact is "material" if it could affect the outcome of the case. Id. The court views the evidence in the light most favorable to the non-moving party and draws "all justifiable inferences" in that party's favor. Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006) (*quoting* Hunt v. Cromartie, 526 U.S. 541, 552 (1999)).  When the moving

party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (*quoting* FED. R. CIV. P. 56(e)). Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

### I.    Breach of Contract Claim.

#### A. Parties' Arguments.

Plaintiff moves for partial summary judgment on its first claim of breach of contract. Plaintiff argues that Bankers breached its insurance contract when it determined that Davis was not a Qualified Home Health Care Provider under the terms of the Policy. The Policy defines Qualified Home Health Care Provider as "a licensed or certified home health care worker, other than a Physician, nurse or professional therapist, who performs Personal Care Services." Bankers denied reimbursement for Davis' services on the grounds that she did not meet this definition, arguing that only CNAs and those licensed in Oregon to provide home healthcare were "licensed or certified" under the Policy as home health care workers. The Policy does not define "licensed or certified" or specify the resulting jurisdiction or authority for such license or certification. Plaintiff contends that "licensed or certified" plainly means "granted permission by a competent authority to provide home health care services," regardless of the authority's location, and that Davis met this definition because she was certified by the state of Washington to provide home health care. In response, Bankers argues that plaintiff's definition of "licensed and certified" is too broad, and that there are genuine issues of material fact regarding both the meaning of "licensed or certified" and whether Davis falls within plaintiff's interpretation of the terms.

## B. Analytical Framework.

Resolution of plaintiff's breach of contract claim turns on the interpretation of the phrase "licensed or certified" in the Policy issued by Bankers. The interpretation of an insurance policy is a question of law and not of fact. Hoffman Constr. Co. v. Fred S. James & Co, 313 Or. 464, 469 (1991). Only the four corners of the policy may be used when examining a policy; extrinsic evidence is not admissible as an aid to interpretation. Ortiz v. State Farm Fire & Cas. Co., 244 Or. App. 355, 360 (2011). When interpreting insurance contracts, "[t]he primary and governing rule" is to "ascertain the intention of the parties." Hoffman, 313 Or. at 469 (*quoting* Totten v. New York Life Ins. Co., 298 Or. 765, 770 (1985)). To obtain the intent of the parties, the court first looks to the terms and conditions of the policy. Id. If a particular term is not defined in the contract and could be construed in different ways, the court follows a series of steps to give the term meaning. Id. If the term's meaning is still ambiguous after these steps, then the term is construed against the drafted and in the insured's favor. Id. at 470-471.

The first step a court follows to define an unclear term is to identify the term's "plain meaning." Id. A dictionary definition may be used to help determine the plain meaning of a term. Id. If the term has a plain meaning, then that meaning is applied and no further analysis is done. Ortiz, 244 Or. App. at 360. If the term is still susceptible to more than one plausible explanation after this step, however, the court turns to the second step: analyzing the particular context in which the term is used in the policy, and the broader context of the policy as a whole. Hoffman, 313 Or. at 470. At this step, the court looks to "all parts and clauses" of the insurance contract to determine "if and how far one clause is modified, limited, or controlled by others." Id. (*quoting* Denton v. Int'l Health & Life, 270 Or. 444, 450 (1974)). Only if multiple plausible

interpretations of the term remain after this second step should the term be construed in the insured's favor. Id. As the court stated in Hoffman, "when two or more competing, plausible interpretations prove to be reasonable after all other methods for resolving the dispute over the meaning of particular words fail, *then* the rule of interpretation against the drafter of the language becomes applicable, because the ambiguity cannot be permitted to survive." Id. at 470-471.

### C. Discussion.

Using the analysis set out in Hoffman, the court finds that plaintiff's interpretation of "licensed and certified," which is not defined in the Policy, is correct, and that Bankers breached its contract by refusing to reimburse plaintiff for the cost of Davis' services. A dictionary definition may be used to ascertain a term's plain meaning. In this case, plaintiff relies on Merriam-Webster's online dictionary definition of "license" as "permission to act" or "a permission granted by a competent authority to engage in a business or occupation or in an activity otherwise unlawful." Pltf. Memo in Support of Mot., p. 9 (citing Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/license (last accessed January 15, 2013)). "Certify" is defined in the same dictionary as "to recognize as having met special qualifications (as of a governmental agency or professional board) within a field." Id. (citing Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/certify (last accessed January 15, 2013)). Plaintiff argues that "licensed or certified," then, plainly means "granted permission by a competent authority to provide home health care services."

While the court agrees with plaintiff that "licensed or certified," as used in the Policy, plainly means "granted permission by a competent authority to provide home health care services," the court finds that there is ambiguity as to the meaning of "competent authority." That is, it is unclear under the definition whether only health care agencies or facilities in certain

states may grant permission to provide home health care services, or whether *any* health care

agency or facility may grant permission to provide home health care services.

Because there is still ambiguity as to the meaning of "licensed or certified," the court

turns to the second step in the Hoffman analysis: considering the particular context in which the

term is used in the policy and the broader context of the policy as a whole. Hoffman, 313 Or. at

470. At this step, the court considers "if and how far one clause is modified, limited, or

controlled by others." Id. (*quoting* Denton, 270 Or. at 450). When examining the policy in its

entirety, the court "assume[s] that parties to an insurance contract do not create meaningless

provisions," and thus favors interpretations of a term that give meaning to all provisions. Id. at

472.

Using this analysis, the court finds that "licensed or certified," as used in the definition of

a "Qualified Home Health Care Provider," means "granted permission by *any* competent

authority to provide home health care services." The court notes that the phrase "licensed and

certified" is used with qualifiers in the majority of the Policy, but not in the definition of

"Qualified Home Health Care Provider." The Policy's definition of "Assisted Living Facility,"

for example, is a facility "certified as an assisted living residence *by the state*." Pltf. Ex. 1 at 7

(emphasis added). Likewise, the Policy's definition of a "Home Health Care Agency" is an

agency or organization "licensed to provide such care or services *by the appropriate licensing*

*agency where they are performed*," and "Residential Care Facility" is defined as a facility

"licensed or certified *by the appropriate state agency to provide ongoing care*." Id. at 11, 13

(emphases added). Only the definition of a Qualified Home Health Care Provider is simply "an

individual licensed or certified to provide home health care services," with no limits on the

location of the facility. Applying the principal that all parts of an insurance contract should be

given meaning, <u>Hoffman</u>, 313 Or. at 470, the court finds that the lack of qualifier to the phrase "licensed or certified" in the definition of "Qualified Home Health Provider" is intentional. Accordingly, the court finds that "licensed or certified," as used in the in definition of "Qualified Home Health Care Provider," refers to *any* competent authority providing home health care services, regardless of the authority's location.

The court turns next to whether Davis was in fact a "Qualified Home Health Care Provider." Adopting the definition of "licensed and certified" set forth above, a "Qualified Home Health Care Provider" is an individual, other than a physician, nurse, or professional therapist, who provides personal care services and is granted permission to provide home health care services by a competent authority. The court finds that Davis meets this definition. Davis is not a physician, nurse, or professional therapist, and Washington's Aging and Adult Services Administration, a competent authority, issued Davis a certificate following a three-day course on "Caregiving Fundamentals" to provide home health care services. Because Davis was a Qualified Home Health Care Provider under the Policy's terms, the court finds that Bankers breached its contract with Katherine Fallow when it refused to compensate plaintiff for Davis' services. Summary judgment is GRANTED to plaintiff on its breach of contract claim.

### D. Damages.

In its own motion for summary judgment, Bankers argues that if plaintiff recovers on his breach of contract claim, there is no question of fact that recovery should be limited to economic damages in the amount of unpaid policy benefits, and that recovery should not include attorney fees and non-economic damages. Bankers contends that a court may only award attorney fees to a litigant if authorized to do so by statute or contract. Bankers also argues that, as a matter of law, plaintiff cannot recover non-economic damages.

## 1. Attorney Fees.

Generally, "a court awards attorney fees to a litigant only if a statute or contract

authorizes such an award." Swett v. Bradbury, 335 Or. 378, 381 (2003). In this case,

Or.Rev.Stat. § 742.061 authorizes an award of attorney fees. The statute provides, in part:

> [I]f settlement is not made within six months from the date proof of loss is filed
> with an insurer and an action is brought in any court of this state upon any policy
> of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount
> of any tender made by the defendant in such action, a reasonable amount to be
> fixed by the court as attorney fees shall be taxed as part of the costs of the action
> and any appeal thereon.

For the purposes of Or.Rev.Stat. § 742.061, "proof of loss" is any "event or submission

that would permit an insurer to estimate its obligations." Dockins v. State Farm Ins. Co., 329 Or.

20, 29 (1999). Here, on October 8, 2010, in response to plaintiff's argument that he should be

reimbursed for Davis' and Watters' services, Bankers sent plaintiff a letter stating that it would

reimburse plaintiff for Davis' and Watters' work up to the Maximum Weekly Benefit of the

Policy for the services they had provided through mid-October. In conjunction with the letter,

Bankers sent plaintiff checks totaling $9,097.01. Plaintiff filed his lawsuit on April 14, 2011,

over six months after Bankers' proof of loss. Because plaintiff's economic damages on its

breach of contract claim include reimbursement for *all* of the services provided by Davis and

Watters, plaintiff's recovery clearly exceeds the $9,097.01 offered by Bankers to settle.

Plaintiff's breach of contract claim meets the requirements of Or.Rev.Stat. § 742.061 for attorney

fees. Bankers' motion for summary judgment on this point is DENIED.

## 2. Noneconomic Damages.

A successful plaintiff on a breach of contract claim is usually limited to recovery of

economic damages. Moser v. DKN Ind., 191 Or. App. 346, 349 (2004) (citing Keltner v. Wash.

Cnty., 310 Or. 499, 504 (1990). That is, "when a contract is breached the injured party is entitled

to receive what he would have if there had been no breach; he is not entitled to receive more." Timberline Equip. Co., Inc. v. St. Paul Fire & Marine Ins. Co., 281 Or. 639, 646 (1978) (citation omitted). In this case, plaintiff's recovery on its breach of contract claim is limited to reimbursement for care provided by Davis. Bankers' motion for summary judgment as to noneconomic damages for plaintiff's breach of contract claim is GRANTED.

## II.     Bad Faith Claim.

Bankers also moves for summary judgment on plaintiff's claim of bad faith. Plaintiff's second claim in the operative complaint alleges that Bankers acted in bad faith when it refused to pay benefits under the Policy for the services of both Davis and Watters on the grounds that neither were Qualified Home Health Care Providers. Bankers contends that plaintiff's bad faith claim is premised on the same facts as its breach of contract claim and is thus barred under Oregon law.

The court agrees with Bankers. Unlike many other states, Oregon does not allow first-party bad faith claims. That is, "an insurer's bad faith refusal to pay policy benefits to its insured sounds in contract and is not an actionable tort in Oregon." Emp'rs Fire Ins. Co. v. Love It Ice Cream Co., 64 Or. App. 784, 791 (1983). In this case, plaintiff's bad faith claim and breach of contract claim rely on the same conduct: nonpayment of benefits under the Policy. Plaintiff's liability is exclusively for breach of contract, not for a tort. Summary judgment in favor of Bankers on plaintiff's bad faith claim is GRANTED.

## III.    Fraud Claim.

Bankers also moves for summary judgment on plaintiff's third claim of fraud. In the operative complaint, plaintiff alleges, "Bankers represent that it spoke to Linda Davis, and that she said she was not a Home Health Aide." Pltf. Sec. Am. Compl., ¶ 51. Plaintiff asserts that

Bankers made the representation in an effort to have Katherine Fallow rely on it and not seek

reimbursement for Davis' services, and that the representation was false because Davis *was* a

Qualified Home Health Care Provider under the Policy.[4]

Bankers argues that plaintiff's allegations do not constitute fraud because Davis'

statement was truthful. Bankers contends that when Davis was deposed, she admitted that she

was not a CNA or otherwise authorized by the state of Oregon to provide home healthcare

services. Under Bankers' definition of a Qualified Home Health Care Provider, Bankers argues,

this statement was an admission that Davis did not meet the Policy's requirements. Bankers also

argues that plaintiff's allegations do not constitute fraud because there is no evidence plaintiff

relied on this statement to his detriment.

To sustain a fraud claim, a plaintiff must prove (1) the defendant made a false, material

misrepresentation; (2) the defendant did so knowing that the representation was false; (3) the

defendant made the statement intending that plaintiff rely on it; (4) plaintiff did in fact rely on

the misrepresentation; and (5) plaintiff was damaged as a result of the reliance. Strawn v.

Farmers Ins. Co. of Oregon, 350 Or. 336, 352 (2011).

Regardless of whether Bankers in fact misrepresented its conversation with Davis about

her qualifications, plaintiff cannot establish all of the elements of a fraud claim. Even assuming

Bankers knowingly made a false misrepresentation by stating that Davis admitted that she was

not a Qualified Home Health Care Provider, there is no evidence that plaintiff actually relied on

the statement, or was damaged as a result. Indeed, plaintiff continued to employ Davis after

being told that Davis had admitted she was not a Qualified Home Health Care Provider and after

---

[4] The operative Complaint's fraud claim is solely based on Bankers allegedly knowingly misrepresenting a conversation with Davis about her qualifications. To the extent that plaintiff's Response to Banker's Motion for Summary Judgment discusses the fraud claim in relation to other caregivers and other portions of the Policy, this argument is not considered by the court.

Bankers stated that it would not reimburse plaintiff for Davis' services. Because there is no

evidence of reliance or resulting damages, plaintiff cannot prove the required elements of fraud.

Summary judgment in favor of Bankers on plaintiff's fraud claim is GRANTED.

### LEAVE TO AMEND

Leave to amend should be freely given "when justice so requires." FED.R.CIV.P.

15(a)(2); Lockheed Martin Corp. v. Network Solutions, Inc., 194 F.3d 980, 986 (9th Cir. 1999).

The decision whether to grant leave to amend remains within the discretion of the district court.

Leadsinger, Inc. v. BMG Music Publ'g, 512 F.3d 522, 532 (9th Cir. 2008). In deciding whether

to grant leave to amend, the court may consider (1) whether the request is unduly delayed; (2)

whether the request is made in bad faith or for a dilatory motive; (3) whether the movant has

repeatedly failed to cure the deficiency in previously allowed amendments; (4) whether granting

leave to amend will cause the opposing party undue prejudice; and (5) whether the amendment

sought is futile. Id. (citing Foman v. Davis, 371 U.S. 178, 182 (1962)); Lockheed Martin, 194

F.3d at 986. Of these factors, prejudice to the opposing party carries the most weight. Jackson

v. Bank of Haw., 902 F.2d 1385, 1387 (9th Cir. 1990).

### I.     Summary.

Plaintiff seeks leave to file a third amended complaint to (1) change the basis and factual

allegations of his fraud claim, and (2) include new caregivers in his breach of contract and bad

faith claim. Bankers objects to both amendments.

### II.    Fraud Claim.

Plaintiff's fraud claim in the operative complaint states:

> 51.
> Bankers represents that it spoke to Ms. Linda Davis and that she said she
> was not a Home Health Aide.
> 52.

Linda Davis is a Home Health Aide, under the terms of their policy, and never told them that she did not provide home health care; indeed her invoices reference "senior care" as her activity.

53.

Defendant made the aforementioned misrepresentations falsely and with knowledge of their falsity or with reckless disregard for the truth of the matter.

Plaintiff's Second Amended Complaint, ¶¶51 through 53.

Plaintiff's fraud claim in the proposed Third Amended Complaint states:

64.

Bankers defined the terms Qualified Home Health Care Provider and Home Health Aide in its policy. Bankers maintains the actual definition of qualified home care providers requires the provider must be a currently licensed Registered Nurse, a Licensed Practical Nurse; a Certified Nursing Aide, or included in a government sponsored Nurse Aide Registry.

65.

Bankers knew the definitions in the policy were false because they were different than the definition used internally to assess home care providers.

66.

Bankers intended the Insured rely on the policy definitions of a Qualified Home Health Care Provider and a Home Health Aide because it provided these definitions to the Insured.

67.

The Insured was justified in relying on the definitions in the policy and on Bankers' initial acceptance of Linda Davis when hiring Lorrie Watters, Tonja Ebben and Heather Davis.

68.

The Insured was damaged when Bankers used a different definition to qualify home care providers than defined in the policy because the Insured established relationships of trust with the caregivers during the inordinately long time it took Bankers to notify the Insured of the caregivers' ineligibility.

## 1. Delay.

The first <u>Foman</u> factor the court considers in determining whether to grant leave to amend is whether the moving party substantially delayed in bringing its motion. <u>Foman</u>, 371 U.S. at 182. "Relevant to evaluating the delay issue is whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading." <u>Jackson</u>,

902 F.2d at 1388. Also relevant to the issue of delay is the stage of the case as a whole and whether the complaint includes new legal theories. That is, a party "'is not entitled to wait until the discovery cutoff date has passed and a motion for summary judgment has been filed on the basis of claims asserted in the original complaint before introducing entirely different legal theories in an amended complaint.'" Stations W., LLC v. Pinnacle Bank of Or., No. 06-1419-KI, 2008 WL 1944715, at *7 (D. Or. April 30, 2008) (quoting Acri v. Int'l Ass'n of Machinists & Aerospace Workers, 781 F.2d 1393, 1398-99 (9th Cir. 1986). Additionally, "[t]he district court's discretion to deny a motion for leave to amend is particularly broad where the court has already given the plaintiffs one or more opportunities to amend their complaint." Langley v. Jones, No. 2:11-CV-774-PK, 2012 WL 2019522, at *2 (D. Or. May 18, 2012).

The delay in this case is significant and unexplained. Plaintiff states that it seeks to amend its Complaint due to "facts discovered in the course of discovery." Pltf. Reply to Def.'s Obj. to Mot,, p. 5. However, discovery in this case closed on July 2, 2012. Plaintiff's motion was not filed until October 5, 2012, three months after discovery closed and nearly two months after the parties had submitted motions for summary judgment. Additionally, plaintiff provides no reason the new fraud claim was not included in plaintiff's Second Amended Complaint. While not dispositive, the unexplained delay weighs against plaintiff's motion.

**2. Bad Faith.**

Bad faith exists when "the addition of new legal theories are baseless and presented for the purpose of prolonging the litigation," or when "the adverse party offers evidence that shows 'wrongful motive' on the part of the moving party." Axial Vector Engine Corp. v. Transporter, Inc., No. 05-1469-AC, 2008 WL 4547795, at *4 (D. Or. October 9, 2008) (citations omitted). There is no evidence of bad faith in this case, and this factor thus weighs in favor of plaintiff.

### 3. Prejudice.

Of the <u>Foman</u> factors, prejudice carries the greatest weight. <u>Jackson</u>, 902 F.2d at 1387. "A need to reopen discovery, a delay in the proceedings, or the addition of complaints or parties are indicators of prejudice." <u>Axial Vector</u>, 2008 WL 4547795, at *4. In cases of fraud claims, prejudice may be of particular concern. In contrast to "notice" pleading required for most claims, fraud claims must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). As Bankers points out, this is in part because "fraud and mistake embrace such a wide variety of potential conduct that a defendant needs a substantial amount of particularized information about the plaintiff's claim in order to enable him to understand it and effectively prepare a responsive pleading and an overall defense of the actions." 5A Charles A. Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 1296 (3d ed. 2004).

Bankers' primary objection to plaintiff's motion is based on prejudice. Bankers argues that new discovery will be needed to defend against plaintiff's new fraud claim. Bankers notes that fraud claims are held to a heightened pleading standard in part to allow a defendant to prepare a defense in advance, and that allowing an amendment in this case will significantly prejudice Bankers. The court agrees. Plaintiff's fraud claim in the operative complaint is based on the theory that Bankers knowingly misrepresented a statement Davis made about her qualifications. In contrast, the proposed amended fraud claim is based on the theory that Bankers knowingly misrepresented key terms in the Policy. The proposed amended claim is based on a new, much broader theory of fraud, and a proper defense would likely require substantial new discovery, and potentially new legal research. This factor weighs heavily against plaintiff.

### 4. Futility.

A claim is futile if there is no set of facts that can be proved that would constitute a valid claim. Miller v. RykoffSexton, Inc., 845 F.2d 209, 214 (9th Cir. 1988). There is no evidence at this stage that the amended claim would be futile. Accordingly, this factor weighs in plaintiff's favor.

### 5. Conclusion.

Having considered all of the required factors, the court denies plaintiff's motion for leave to amend its fraud claim. Plaintiff has previously amended his complaint, and the current motion was filed long after discovery closed. More importantly, allowing an entirely new basis for fraud at this stage of the proceedings would be substantially prejudicial to Bankers. Plaintiff's motion for leave to amend its fraud claim is DENIED.

### III.    Additional Caregivers.

Plaintiff also seeks leave to amend its complaint to include caregivers Lorrie Watters, Tonja Ebben, and Heather Davis to plaintiff's breach of contract claim, and to add Tonja Ebben and Heather Davis to plaintiff's bad faith claim.

### 1. Delay, Bad Faith, and Futility.

As stated above, the delay in this case is lengthy, and plaintiff has not adequately stated its reasons for not amending its complaint earlier. The caregivers whom plaintiff seeks to add to its breach of contract claim were identifiable to plaintiff early on, and discovery closed nearly three months before plaintiff sought leave to amend its complaint to add the additional caregivers. Delay weighs against granting plaintiff leave to add additional caregivers. The court does not find evidence of bad faith or that, at this stage, plaintiff's amendment of its breach of contract claim would be futile. These factors weigh towards granting leave to amend.

**2. Prejudice.**

While Bankers will likely be prejudiced by the addition of new caregivers to plaintiff's breach of contract claim, the court finds that the prejudice will not be severe. Unlike plaintiff's proposed amendment to its fraud claim, the addition of new caregivers does not change the basis or theory behind the breach of contract claim. While discovery may need to be briefly re-opened to allow for additional limited discovery, the prejudice in allowing leave to amend to add new caregivers is less significant than in allowing amendment of the fraud claim. Having considered the Foman factors, the court GRANTS plaintiff's motion for leave to amend its complaint to allow the addition of new caregivers to plaintiff's breach of contract claim.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment is GRANTED, defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART, defendant's motion to strike is DENIED, and plaintiff's motion for leave to amend is GRANTED IN PART AND DENIED IN PART.

IT IS SO ORDERED.

DATED this _____ day of January, 2013

_____
MARK D. CLARKE
United States Magistrate Judge